528 So.2d 934 (1988)
SEABOARD SYSTEM RAILROAD, INC., Appellant,
v.
Ronald E. MELLS, Appellee.
No. BT-144.
District Court of Appeal of Florida, First District.
July 7, 1988.
*935 Robert E. Roundtree, Jr., of Clayton, Johnston, Quincey, Ireland, Felder, Gadd, Smith & Roundtree, Gainesville, for appellant.
Terence J. Kann, of Weiss, Kann, Heaton & Kerner, Gainesville, for appellee.
WIGGINTON, Judge.
This case arose from a tragic accident that occurred at approximately 11 p.m. on November 4, 1983, when plaintiff, Ronald Mells, was run over by a locomotive operated by defendant, Seaboard System Railroad, Inc., resulting in the amputation of Mells' arm. A jury rendered a verdict against Seaboard in the amount of $500,000, while finding Mells to be 60 percent negligent. In accordance with the verdict, a judgment was entered in Mells' favor for $200,000 together with taxable costs. We affirm.
The testimony indicates the night was dark and clear and Mells was wearing dark clothing. He had been drinking (although there was certain evidence that he was not legally drunk) and began to feel nauseous while walking back to his home. Desiring not to enter his house and allow his mother to see him in an inebriated state, Mells sat down on the railroad tracks running behind his house with his knees drawn up to his chest, his head down between his knees, and his arms folded over his knees. In that position, he began vomiting. There were no street lamps or artificial lighting where he was sitting and he was framed by an entirely dark background. He remembers nothing from that point until he awoke underneath the train.
Mells was 21 years old and had lived almost his entire life near the tracks upon which he was seated. Those tracks composed the main line running from High Springs to Newberry, and Mells' position was approximately 95 and one-half feet from the southern edge of the roadway of Northwest Sixth Avenue just outside Newberry.
The train consisted of over 110 cars, was greater than one mile in length, and had three engines. The driver of the locomotive had been an engineer since 1972 and had traveled this particular set of tracks approximately once a month since 1977. He testified he was not fatigued at the time of the accident and had 20/20 vision.
As the train approached Newberry, the engineer brought it to a complete stop for several minutes at the yard limit sign. As the train picked up momentum and began to approach the accident site, it reached a whistle post approximately 1500 feet from the Sixth Avenue crossing. The engineer estimated that he was traveling approximately 11 miles per hour as he approached the crossing.
Upon reaching the whistle post, the engineer maintained that he began blowing his normal whistle sequence, and as the train continued toward the crossing, its light was on high beam, its bell was changing, and it continued to blow the crossing signal. Approximately 400 to 500 feet from the point of impact, the engineer noticed an object on the tracks he thought was a plastic bag of garbage. At approximately 300 feet, the engineer recognized the object as being a human being and interrupted his normal *936 crossing warning to begin blowing short choppy blasts. He testified that he continued to watch Mells for 12 to 15 seconds and maintained that he threw the train into an emergency stop at approximately 200 feet from the point of impact. Unfortunately, Mells never moved and was run over, the locomotive finally coming to a stop at the southern edge of Sixth Avenue, 95 and one-half feet after striking Mells.
Mells' expert witness, physicist Leonard Laketek, testified that his calculations showed the stopping distance of the train operated on the night in question was 115 feet assuming a speed of 10 miles per hour, and 135 feet assuming a speed of 11 miles per hour.
Another of Mells' witnesses, retired engineer Virgil Elbon, opined that the train could stop in about 120 to 130 feet at a speed of 10 to 11 miles per hour.
In sum, the evidence showed that at between 400 and 500 feet, Mells was sighted by the engineer. He was positively identified at 300 feet and was observed by the engineer for 12 to 15 seconds before realizing that he was not going to move. The train had a stopping distance at the speed it was traveling of between 115 and 135 feet and came to rest approximately 95 and one-half feet after running over plaintiff. There was a trail of sand going back from the point where the lead engine came to a rest for a distance of 240 feet, which sand exits the front end of each locomotive when emergency brakes are applied. Since at the time Mells was struck three of Seaboard's locomotives were running and had sanders in operation, the length of the sand trail is consistent with the length of the 10 miles per hour stopping distance of 115 feet plus the distance from the front of the first locomotive to the front of the third locomotive.
Experts opined that at the time of the injury, Mells' probable blood alcohol level was .095 and that the effect of such a level would be to somewhat alter his judgment and perception of a dangerous situation and slightly affect his coordination, but not render him comatose or unable to perceive the presence of a train. However, there was uncontroverted testimony that Mells was not suicidal at the time of the injury. There was also evidence that pedestrians regularly crossed the tracks in the area in which Mells was struck.
Seaboard's first point on appeal challenges the trial court's granting of Mells' motion in limine prohibiting Seaboard from raising Mells' alleged status as a trespasser on Seaboard's property, or mentioning that fact to the jury. It is Seaboard's position that Mells' status as a trespasser significantly altered the duty owed him by Seaboard. Seaboard relies on several early appellate and supreme court cases for the proposition that as a trespasser or a mere licensee, it owed no duty to Mells except not to harm him wilfully or wantonly, or to set traps for him, or to expose him to dangers recklessly or wantonly. See Louisville and Nashville Railroad Company v. Holland, 79 So.2d 691 (Fla. 1955); Atlantic Coastline Railroad Co. v. Webb, 112 Fla. 449, 150 So. 741 (1933); Adams v. Florida East Coast Railway Company, 179 So.2d 374 (Fla. 3d DCA 1965). By precluding it from raising the issue of trespasser's status, Seaboard argues the court held it to the much higher duty owed to an invitee  the duty to use ordinary care for plaintiff's safety.
Furthermore, Seaboard points to the rule of law stating that the train crew was entitled to assume that Mells would obey the instinctive law of self-preservation and get off the track, and by the time the crew realized that he was not going to move, it was too late to stop the train. See Atlantic Coastline Railroad Company v. Walker, 113 So.2d 420 (Fla. 1st DCA 1959).
Although Seaboard then attempts to distinguish the cases relied on by Mells in support of his motion in limine, we must agree that the subsequent decisions in Hix v. Billen, 284 So.2d 209 (Fla. 1973) and Maldonado v. Jack M. Berry Grove Corp., 351 So.2d 967 (Fla. 1977) altered the long-standing principles described above as they apply to the instant case. In Hix v. Billen, the Florida Supreme Court confronted the rule applying different duties owed by the owner of premises to invitees and licensees. *937 The supreme court specifically noted a distinction between "active, personal negligence on the part of the landowner and that negligence which is based upon a negligent condition of the premises." Id. at 210. Accordingly, it adopted the opinion which it was reviewing to the effect "that where the presence of the injured person is known to landowner and the injury is caused by the active conduct or affirmative negligence of the landowner, as distinguished from the conditions of the premises, ordinary negligence is the measure of care as in other negligent situations." Id. (Emphasis supplied.) Thus, as the supreme court later explained in Maldonado v. Jack M. Berry Grove Corp., "[o]nly when liability is predicated upon an alleged defective or dangerous condition of the premises is the injured person's status relevant." 351 So.2d at 968. Consequently, when liability is predicated upon the negligence of the landowner to the person injured on his property unrelated to any defective condition of the premises, the status of the person injured is irrelevant and the standard of ordinary negligence set forth in Hix governs the landowner's liability. The court was also careful to note in Maldonado that this rule is applicable to liability based upon either the active or passive negligence of the landowner. Id., n. 2.
Hix and Maldonado were applied to circumstances similar to those in the instant case by the Fourth District Court of Appeal in Florida East Coast Railway Company v. Gonsiorowski, 418 So.2d 382 (Fla. 4th DCA 1982). In that case, the plaintiff, who had been drinking, attempted to cross the defendant's railroad tracks at night at a place which was not designated as a crossing but was often used as such by the public. He tripped over a pile of railroad spikes, struck his head on one of the rails, and was rendered unconscious. At this time, the defendant's train was proceeding at 25 miles per hour and was blowing its whistle. Still unconscious, the plaintiff did not react and although the engineer saw an object on the track much earlier, it was not until the train was 150 feet away that he realized a man was lying on the track and applied the emergency brakes. The train was unable to stop and the plaintiff's legs were severed. At the conclusion of the trial, the jury rendered a special verdict finding the defendant 25 percent negligent and the plaintiff 75 percent negligent. On appeal, the defendant railroad raised two points both relating to the issue of the plaintiff's status on the property. It contended that the trial court erred in failing to direct a verdict on the grounds that the plaintiff was either a trespasser or an uninvited licensee as a matter of law and that the railroad violated no duty to the plaintiff as one in this classification.
In finding that the trial court's refusal to direct a verdict in the defendant's favor was not error, the court noted that the plaintiff suffered two distinct injuries. When he tripped over the spikes and struck his head on the track, he was indeed either an undiscovered trespasser or an uninvited licensee since the injury was caused by a condition relating to the tracks, or the premises. As such, the railroad owed no duty other than to avoid wanton and willful harm to him, and, as an uninvited licensee, the additional duty of warning him of any known dangers not open to ordinary observation. Compare Wood v. Camp, 284 So.2d 691 (Fla. 1973). Finding that there was evidence presenting a jury question on negligence and whether the danger was open to ordinary observation, the court ruled that a directed verdict would have been improper.
However, as to the second injury which occurred when the plaintiff was struck by the train, the court ruled that the trial court quite properly denied a directed verdict on the basis that the plaintiff's status on the property was irrelevant with respect to the injury, as the injury was not caused by the condition of the premises but rather by the operation of the train. Citing Maldonado and Hix, the court reiterated the rule that where the liability of a landowner to a person injured on his property is unrelated to any defective condition of the premises, the standard of reasonable care under the circumstances governs. Accordingly, the court also held that the defendant's second point regarding the court's *938 failure to instruct the jury on status fell along similar lines.
In arguing that the rule in Hix is inapplicable to the instant case, Seaboard points out that in the underlying appellate opinion of Billen v. Hix, 260 So.2d 284 (Fla. 4th DCA 1972), adopted by the supreme court in Hix, the court specifically noted that its factual situation and holding did not apply to cases such as Pensacola, St. Andrews & Gulf S.S. Co. v. Austin, 63 Fla. 241, 58 So. 611 (Fla. 1912). Seaboard contends that Pensacola is factually similar to the instant case. We must disagree. The Fourth District Court of Appeal in Billen was careful to note that a close reading of Pensacola shows that the case does not mean that no distinction may be drawn between the negligence of the landowner and instances involving only the condition of the premises. Instead, in that case, the key factor was that the plaintiff had situated herself in a place where her presence could not have been anticipated by the defendant. The trial court held that it would have been unreasonable to impose upon the defendant the duty to make the place completely safe for the plaintiff, even though the plaintiff's presence had been discovered by one of the defendant's employees shortly before the accident. The court also noted that a subsequent case relying on Pensacola was later characterized as representing a "`decreasing minority view'" and "does not comport with either the unmistakable trend in this area of the law, or with sound logic." Id. at 287.
Indeed, with the advent of the Hix decision, the continuing validity of Pensacola is questionable. Alternatively, Pensacola lends itself to be classed as a case involving defective conditions of the premises. Moreover, it was also the Fourth District Court of Appeal who rendered the decision in Gonsiorowski, which case is precisely on point with the instant case. Accordingly, we hold that the trial court did not err in granting Mells' motion in limine prohibiting Seaboard from raising Mells' status as trespasser on its property or mentioning that fact to the jury.
Turning to point two, Seaboard argues that the trial court erred in denying several of its requested jury instructions. Requested instructions numbered 5 and 8 are based on Mells' status as a trespasser and were therefore properly denied by the trial court along similar lines as discussed above.
Requested instruction number 9A sets forth the rule found in Atlantic Coastline Railroad Company v. Walker regarding the presumption to which the train crew was entitled, to wit, that plaintiff would obey the instinctive law of self-preservation and get off the track. Specifically, requested instruction number 9A stated:
The engineer in charge of a railroad locomotive has the right to presume that an adult person whom he sees upon or beside the track ahead of his approaching engine is in possession of his faculties, and that he will obey the instinctive law of self-preservation by getting off the track if already on it, or that he will not get on it, if already off; and that in such case it would not be negligence on the engineer's part if he failed to attempt to stop his engine, unless he knew the party, and that he labored under some disability.
An instruction similar to the one just cited was denied the defendant in Florida East Coast Railway Co. v. McKinney, 227 So.2d 99 (Fla. 1st DCA 1969). In affirming the trial court's denial of the requested instruction, this Court noted that the Committee on Standard Jury Instructions in its comments recommended against the giving of such charge. We also held that although the charges in question correctly stated the principles of law, "such charges as framed are essentially argumentative, repetitive, and adequately covered by the general charges on negligence." Id. at 104. See also Seaboard Coastline Railroad Company v. Addison, 481 So.2d 3 (Fla. 1st DCA 1985). Presently, the Committee recommends that no charge be given on the reciprocal duties of a pedestrian and train in collision cases. See Florida Standard Jury Instruction 4.14(b) and Comment. As was the case in McKinney, we also conclude *939 that the trial court did not err in denying requested instruction number 9A.
Lastly, Seaboard contends that the trial court erroneously refused to give its requested instruction number 10 regarding the defense of express assumption of the risk. It bases its argument on the holdings in Kuehner v. Green, 436 So.2d 78 (Fla. 1983) and Robbins v. Department of Natural Resources, 468 So.2d 1041 (Fla. 1st DCA 1985). Seaboard points to Mells' own testimony that he acknowledged that the tracks were dangerous and were not a place where he should have been. We disagree that these facts are appropriate for the application of the doctrine of express assumption of the risk. Mells also testified that he was not "worried" when he sat down on the tracks because he "didn't think nothing would happen," and that if a train did happen to come along, he simply would have moved "out of the way." We agree with Mells that it was not shown that he subjectively assumed the risk that Seaboard would or could not stop its train on time to avoid hitting him or that his own protective mechanisms would fail to alert him to the approaching train. Using the Robbins analysis, there was absolutely no showing that Mells had any idea that once he sat down on the tracks he would lose his ability to perceive the approach of the train; that when he sat down on the track there was a train approaching; and that he subjectively knew that the train would be unwilling or unable to safely apply its brakes. In short, we hold that Mells was unable to appreciate the danger in which he placed himself, unlike the plaintiff in Kuehner or apparently the plaintiff in Robbins. Accordingly, we affirm the trial court's denial of requested jury instruction number 10 on express assumption of the risk.
Regarding the remaining issues, we feel it necessary only to state that the trial court did not err in allowing the deposition opinion testimony of Virgil Elbon, did not err in allowing the expert opinion testimony of Leonard Laketak, and did not err in denying Seaboard's motions for directed verdict. As to that latter point, Seaboard below relied on the Walker presumption in urging its motion for directed verdict, arguing that unless the railroad knew the person and knew he suffered from some disability, it would not be negligence on the railroad's part to fail to attempt to stop the train. It pointed to the engineer's testimony that as soon as he realized Mells was not going to remove himself from the tracks, he threw the train into emergency stop. Whether or not the principle set forth in Walker survives Hix and the principle of comparative negligence, an issue we do not reach today, we hold that there was sufficient evidence in the instant case to suggest a jury question on the engineer's knowledge of Mells' incapacity to move and his decision as to when to stop the train, the evidence tending to show that despite the engineer's testimony, the brakes were not applied until, at best, when the train was only 38 and one-half feet away from the immobile Mells. In contrast, in Walker, the evidence was apparently uncontroverted that the crew did not perceive the plaintiff's incapacity until it was too late to stop the train. Compare also Box v. South Georgia Railway Company, 433 F.2d 89 (5th Cir.1970).
Accordingly, based on the foregoing, the final judgment awarding $200,000 in damages plus costs to Ronald Mells is hereby AFFIRMED.
ZEHMER, J., concurs.
BOOTH, J., concurs specially with written opinion.
BOOTH, Judge, specially concurring.
I agree with the majority to affirm and that the trial court did not commit reversible error in granting motion in limine and in refusing to give the requested instructions on trespasser/invitee, on the instinct of self-preservation, and on express assumption of risk. Defendant's engineer testified that he recognized the object on the track was a human being for 12 to 15 seconds before he tried to stop the slow-moving train, that he had first seen the object when the train was 400 to 500 feet away, and that he did not observe it move at any time as the train approached with *940 whistle blasting. The engineer testified, in part, as follows:
Q [plaintiff's counsel] The question was didn't you watch him from the time you were at 300 feet away from him, when you identified him as a human, from that point forward, and you knew he was a human, and you were able to describe his position and the color of his clothes, you watched him for 12 to 15 seconds before you hit your brake with your bright lights on him, with your horn going, and he never moved at all, including he never moved until you ran him over, isn't that correct?
A [defendant's engineer] That is correct.
Since the engineer recognized at 300 feet from impact (and in time to stop the train) that the object was a human being in peril, it was immaterial from a legal point of view whether the person on the track was a trespasser or not. The same duty to use due care to avoid injury applies to the discovered trespasser, as it does to the licensee, and the jury was properly instructed as to that duty. As to the instruction on the assumption that a person will act in accordance with the instinct for self-preservation, the testimony of the engineer undercuts the basis for any reasonable assumption that the immobile person on the track would move in time to avoid injury or death. Failure to give that instruction, if error, was harmless. Finally, since the doctrine of express assumption of risk is, apparently, inapplicable, Gorday v. Brown, 523 So.2d 1215 (Fla. 1st DCA 1988), the requested instruction on that doctrine was properly denied. I, therefore, agree with the majority that the jury verdict should be affirmed.