573 So.2d 850 (1990)
FLORIDA EAST COAST RAILWAY COMPANY, a Florida Corporation, Appellant,
v.
Alan Raymond PICKARD, Appellee.
No. 89-808.
District Court of Appeal of Florida, First District.
September 4, 1990.
On Motion for Rehearing February 6, 1991.
*851 Luke G. Galant of Dawson, Galant, Sulik, Wiesenfeld & Bickner, Jacksonville, for appellant.
Gary C. Pajcic and Michael B. Wedner of Pajcic & Pajcic, P.A., Jacksonville, for appellee.
*852 MINER, Judge.
Florida East Coast Railway Company (FEC) appeals from a final judgment entered pursuant to a jury verdict finding FEC partially at fault for a railroad accident that resulted in serious personal injuries to appellee, Alan Pickard. We reverse.
Trial testimony established that for some two years prior to the accident in question, Alan Pickard, a man in his early twenties, had been pursuing a nomadic lifestyle. His peregrinations had taken him throughout the Southwest, the Pacific Coast states and into Montana and Wyoming as he sought to satisfy his curiosity about whether this country "was as great as everyone says it is." Arriving at his destination of the moment, he would find employment at odd jobs and work until the urge came upon him to travel on. His primary mode of transportation from place to place was hitchhiking but, on at least one occasion in the far West, he hopped a moving freight train.
Eventually, Pickard found his way to Jacksonville where in late January or early February, 1986, he and a friend hopped a FEC freight train to Miami where he worked about three weeks as a carnival roustabout. Tiring of such work and intending to return to his parents' home in suburban Atlanta, on the evening of Saturday, February 22, 1986, he hopped a northbound FEC freight train back to Jacksonville. When the train pulled into the FEC freight yards the following Sunday morning, Pickard alighted and, knapsack and bedroll on his back, started to walk north through the yard. He recounted that after walking for some distance along the tracks, he happened upon two men who exited a vehicle he described as a "company car" with a FEC logo on the fender.[1] He assumed these men were employees of FEC and asked them where he could go to hop a freight across the St. Johns River.[2] He said one of the unknown men pointed to University Bridge up ahead and told him what time the next freight train would pass that location. He thanked the man and said the man responded "good luck."
Pickard walked to University Bridge and waited underneath the overpass for the freight train to appear as he was told it would. When no train arrived after about a half hour, he grew impatient, climbed up the embankment and left FEC's premises. He walked over to a fast food restaurant nearby for some refreshment. When he left the restaurant, he walked back toward University Bridge with the intention of crossing over the bridge and walking to the highway to hitch an automobile ride north.[3] It was drizzling rain when Pickard reached the bridge over the railroad tracks. There he saw a freight train coming. He clambered back down the embankment, re-entered on FEC's premises and, satisfied that he had avoided detection by anyone on the train, attempted to board a flatcar near the end of the train which was traveling at about 30 MPH. The train gave a sudden lurch which resulted in his legs being drawn underneath. One of his legs was amputated on the spot and his other foot was subsequently surgically removed.
On January 14, 1988, Pickard filed a complaint against FEC alleging, among other things, that it was negligent in that its employees knew he was going to board a train and failed to warn him of, or take any measures to prevent, the danger, and that it was negligent in failing to maintain any written policy for dealing with trespassers. FEC's answer denied any negligence, pleaded that Pickard was a trespasser or, at most, an uninvited licensee to whom it owed only a duty to refrain from willful and wanton acts and to warn of dangers known to it but not apparent and asserted *853 that Pickard's negligence was the sole proximate cause of the accident.
Among the witnesses as to liability called by plaintiff at trial was Ferrell Vincent, a former railroad safety inspector for the Federal Railroad Administration. Mr. Vincent offered the opinion that FEC was negligent for failing to have in place a written policy "requiring employees to protect against trespassers" and instructing employees "in methods to achieve their result." As an example of the type of written policy he testified was standard in the industry, Mr. Vincent cited with approval the written trespass policy of the Seaboard Railroad system. He read that policy into the record:
Trespassing on railroad property is dangerous to trespassers as well as to employees and is prohibited. Employees are expected to use reasonable means to prevent trespassing. When feasible children must be warned and courteously escorted from the property. Others must be tactfully told to leave. Do not try to physically block or eject trespassers. To do so could prove to be dangerous. If the trespasser refuses to leave the property after being tactfully told to leave, prompt report must be made to proper authority or security officer.
At the close of plaintiff's case, FEC moved for directed verdict. The trial court granted the motion as to two issues raised in the complaint but denied it with regard to the issue of Pickard's status and FEC's negligence in light of that status and with regard to whether FEC was negligent in failing to maintain a written policy regarding trespassers.
At the close of all testimony, FEC renewed its motion for directed verdict on the remaining issues which motion the court took under advisement. After its deliberations, the jury returned a verdict finding plaintiff's damages to be $4,000,000, but finding him 90% negligent and FEC 10% negligent. The court entered judgment on the verdict and this appeal ensued.
From what we can glean from reading appellant's briefs and plumbing the depths of the record on appeal, three issues are presented for our review.[4] First, it urges that the trial court reversibly erred in refusing to grant FEC's motion for directed verdict based on its argument that, as a matter of law, Pickard's gross negligence was the sole, active, direct, proximate legal cause of the accident and that FEC was not negligent. Next, FEC argues that the trial court erred in denying its motion in limine to prohibit plaintiff from alluding to other trespasser accidents which have previously occurred along FEC's operating line and to the alleged conversation between Pickard and the unidentified supposed employees of FEC. Lastly, FEC maintains that the gross amount of damages found was excessive.
Concluding, as we have, that the trial court did not err in admitting testimony regarding prior accidents and the conversation Pickard said he had with the two unidentified men in FEC's freight yard, we affirm as to this point. Reasonable persons could speculate as to the truthfulness of Pickard's account of the circumstances surrounding this chance encounter and the substance of the conversation, but we view that as a matter for the jury to decide.[5] *854 Likewise, we do not find that the amount of damages awarded is so gross as to shock the conscience of the court and thus affirm on this point. However, finding that the trial judge erred in not granting FEC's motion for a directed verdict on the issue of causation, we reverse.
Here, as below, appellee maintains that FEC was negligent at both the management and the operational levels of its railroading activities. At the management level, he faults FEC for "failing to adopt and enforce a uniform written rule for its employees to follow in encountering trespassers." The essence of appellee's argument that there was operational negligence involved in his accident is succinctly stated in his brief:
The conduct of the two employees who pointed the way to Mr. Pickard is by itself sufficient evidence of negligence by FEC. The two employees should have told Mr. Pickard to leave. If he did not, they should have called security. They should have warned Mr. Pickard of the hidden dangers of train hopping. They certainly should not have told him of where to catch the train.
Turning first to the management level negligence issue, we initially observe that the thrust of the written trespasser policy of which appellee's expert approved at trial is, simply stated, to get unauthorized persons off railroad property, tactfully, if possible. Only if a trespasser refuses to leave is the employee directed to summon "proper authority." Whether told to do so or not or whether his discoverers have knowledge of his departure or not, once a discovered trespasser, in fact, leaves the premises, perforce he is no longer on the premises, which is, after all, what the rule was fashioned to accomplish. Otherwise stated, if there is no discovered unauthorized person on the premises, there is no one upon whom a written policy could operate.
To predicate FEC's liability in this case on a no-written-trespasser policy is to forget that there must be a causal connection between the negligence complained of and the injury suffered by appellee. Here, assuming the truthfulness of Pickard's account, the men he encountered did not tell him to leave nor did they escort him off the premises.[6] However, he left FEC property of his own accord and for his own purposes. With his departure, his status changed from that of unauthorized but discovered person on premises to invited patron of Wendy's Restaurant. On this record, we can discern no causal relationship between the fact that FEC did not have a written trespasser policy and appellee's injuries and hold that no such relationship existed as a matter of law.
The operational negligence argued by appellee before this court amounts to the following: (1) the two employees should have told Pickard to leave; (2) they should have warned Pickard of the hidden dangers of train hopping; and (3) they should not have told him where to go to catch the train.
It is not urged on appeal that FEC employees were guilty of negligence in the operation of the train that caused Pickard's injuries. Significant to note, also, is the fact that at all times pertinent to this matter, appellee's status as a trespasser or, at best, an uninvited licensee on FEC property, has been accepted by the parties as a given. Nor does appellee maintain before this court that FEC's employee's failure to ask him to leave the premises and their directing him to University Bridge underpass amounts to their giving him implied permission to hop a freight or somehow sanctioning his doing so. Presumably, this is so because there was no proof adduced below that FEC had authorized these unidentified persons to give Pickard permission, either expressed or implied, to hop a freight. In the absence of such proof, it cannot be presumed that such employees *855 have such authority, particularly where, as in Florida, such use of the track is made a crime by statute. See generally 75 C.J.S. Railroads, § 900(b), at 280 and § 927(a), at 341-2.[7]
With respect to appellee's first operational negligence argument, it is likely that all reasonable persons would agree that Pickard should have been directed to leave the premises even though he was not at that time in a position of peril. His appointment with tragedy was yet an hour or more away when he encountered the FEC employees. Even though not telling him to leave may be seen as negligent conduct, leave he did and, as we concluded with respect to appellee's management level negligence argument, we can find no causal connection between such negligence and the injuries he suffered.
In addressing appellee's failure-to-warn argument, we deem it appropriate to explore to some extent the development of the law in this area. In cases where, as here, such an argument is necessarily predicated on an injured person's admitted status as a discovered trespasser or uninvited licensee, a landowner has a duty to warn the discovered trespasser of a condition known by the landowner to be dangerous when such danger is not open to ordinary observation. Post v. Lunney, 261 So.2d 146 (Fla. 1972); Wood v. Camp, 284 So.2d 691 (Fla. 1973); Morris v. Florentes, Inc. et al, 421 So.2d 582 (Fla. 5th DCA 1982).
Section 342 of the Restatement (Second) of Torts (1965) which was cited with approval in Morris, supra, provides:
A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
(b) he fails to exercise reasonable care to make the conditions safe, or to warn the licensee of the condition and risk involved, and
(c) the licensee does not know or have reason to know of the condition and risk involved.
Important to note at this point is that the operational negligence complained of in this case, including the failure to warn, occurred an hour or so before Pickard was injured. At the time of his conversation with the unidentified FEC employees, he was, at most, an uninvited licensee entitled to be warned about known dangers not open to ordinary observation. Florida East Coast Railway Co. v. Gonsiorowski, 418 So.2d 382 (Fla. 4th DCA 1982), review denied, 427 So.2d 736 (Fla. 1983). The issue as we see it, however, is not the status he occupied upon his discovery on the premises but rather the duty owed him at the time of his accident.
In Hix v. Billen, 284 So.2d 209 (Fla. 1973), the Florida Supreme Court defined the duty owed persons on premises in terms of the negligence alleged. If the alleged negligence deals with the condition of the premises, the landowner owes no duty to a trespasser or "uninvited guest licensee" except to avoid willful and wanton injury to him and, if his presence be discovered, to give him warning of any known dangerous condition not open to ordinary observation by the uninvited licensee or trespasser. On the other hand, where active conduct or affirmative negligence is alleged and the presence of the licensee is known, ordinary negligence is the "measure of care" owed by the landowner to the licensee. Hix at 210. The effect of Hix, then, is to make an injured licensee's status vis-a-vis the landowner irrelevant in terms of duty owed if his presence on the premises is known to the landowner and if his allegations involve active conduct or affirmative negligence.
*856 Four years later, in Maldonado v. Jack M. Berry Grove Corp., 351 So.2d 967 (Fla. 1977), a sharply divided court reaffirmed the rule of law laid down in Hix in finding liability on the part of a defendant who permitted a "dangerous situation" to develop on its property and failed to take "sufficient" precautions to alleviate the dangerous situation. Indeed, it was the defendant's failure to take precautions that the court found to be the "active conduct" or "affirmative negligence" rendering irrelevant the status of a young child who was determined to be an uninvited licensee.
Hix and Maldonado have been followed in a number of railroad injury cases. See Florida East Coast Railway Co. v. Gonsiorowski, supra; Seaboard System Railroad, Inc. v. Mells, 528 So.2d 934 (Fla. 1st DCA 1988); Shumake v. Florida East Coast Railway Co., 534 So.2d 1178 (Fla. 4th DCA 1988).
Gonsiorowski involved a plaintiff who had been drinking and attempted to cross the railroad tracks at a place not designated as a crossing. He tripped over some railroad spikes near the track and struck his head on one of the rails rendering him unconscious. The engineer of an approaching train saw plaintiff on the track at a distance of about 150' but was unable to stop the train, in part because the train had defective brakes. Raising issues of plaintiff's status on the premises, the railroad company moved for a directed verdict which was denied. From judgment entered on a jury verdict awarding plaintiff $500,000, the railroad appealed. In affirming the judgment, the Fourth District reasoned that actually two injuries had occurred. At the time the plaintiff stumbled on the spikes and fell on the track, "he was either an undiscovered trespasser or an uninvited licensee" entitled to the duty owed to such a person under the dictates of Wood v. Camp, supra. However, finding record evidence that the railroad was on notice that the area in which the spikes were located was used as walkway, the spikes were located in weeds and grass and that a company policy required the spikes to be picked up, the court held that a jury issue existed as to negligence and whether the danger, i.e. the spikes, was open to ordinary observation. As to the injury that occurred when Gonsiorowski was hit by the train, the court held that his status on the premises was irrelevant because the injury was not occasioned by a condition on the premises but rather by negligent operation of the train.
Mells, too, involved a reveler asleep on the railroad track who was hit and injured by a train. From a jury verdict in his favor for $200,000 the railroad company appealed. Citing Hix, Maldonado and Gonsiorowski, this court held that Mells's status on the premises was irrelevant in view of his allegations that the company employees were guilty of negligent operation of the train and that a jury question as to negligence was presented.
In Shumake v. Florida East Coast Railway Co., supra, the plaintiff appealed a judgment on the pleadings entered against him. He had sustained personal injuries when he attempted to cross FEC's tracks by climbing between the cars of a stopped train. As in Gonsiorowski and Mells, he had alleged that his injuries resulted from negligent operation of the train. The Fourth District reversed the granting of a judgment on the pleadings finding that Shumake should be permitted at trial to adduce evidence as he had alleged that FEC had actual or constructive knowledge of his presence but failed to exercise reasonable care for his safety.
It will be observed that in each of the railroad injury cases alluded to above, an issue on appeal involved negligence in the operation of the train. As previously noted, no such issue is raised on appeal in the case at hand. Additionally, in Mells and Shumake, the plaintiffs filed pre-trial motions seeking to preclude the railroad from making their status an issue or referring to them as trespassers. Here, status was made an issue by the plaintiff in order to place himself in a position to complain that FEC's lack of a written trespasser policy and the failure of FEC's employees to tell him to leave the premises caused his injury. In Gonsiorowski and Mells, railroad employees had actual knowledge of the plaintiffs' *857 perilous position at the time of the accident that caused the injuries complained of. In Shumake, the court held only that the plaintiff should be permitted to adduce proof that the railroad company had actual or constructive notice of his presence on the premises "... at the time of the accident...." Shumake, 534 So.2d at 1180. (Emphasis supplied). In the instant case there was no evidence presented below that FEC's train operating personnel had knowledge, either actual or constructive, of Pickard's presence on the premises at the time of the accident. At best, the evidence makes out a case that FEC employees had actual notice of Pickard's presence on FEC property an hour or so earlier at a place considerably remote from the situs of the accident.[8]
Although appellee offered evidence of numerous trespasser accidents along FEC's operating line over the years, such evidence was only relevant to the issue of FEC's failure to have a written trespasser policy in place. There was no testimony or other evidence adduced below that any trespasser had ever been injured in the area around University Bridge underpass or that FEC train operating personnel knew or should have known that a trespasser was in their midst at the time and place of Pickard's accident. Thus, any allegation that FEC knew or should have known of Pickard's presence necessarily relates back to his earlier encounter with the unidentified employees.
Based on his arguments on appeal, it is unclear whether Pickard is attributing his accident to affirmative negligence on the part of FEC employees or a dangerous condition or situation that existed on FEC property. Whatever his theory of negligence, however, his presence on the premises must have been known at the time of his accident for liability based upon failure to warn to attach to FEC. Hix, at 210. For purposes of this analysis, it matters not whether Pickard complains about affirmative negligence or a dangerous condition on FEC premises, the duty to warn remains the same. If such a duty existed under the facts of this case it involved only an obligation to warn him of a known dangerous condition not open to ordinary observation.
Be it remembered that Pickard was not a child of tender years as in Maldonado. Neither had he been drinking at the time nor was he unconscious as was the plaintiff in Gonsiorowski nor was he a helpless inebriate sleeping on the tracks as in Mells. He was a veteran freight train hopper who believed himself at the time of his accident to be conversant with the dangers attendant to jumping freights.[9] Since there is no evidence in the record from which it could be inferred that the unidentified employees were possessed of any greater appreciation of the dangers of freight hopping than was Pickard, one might rhetorically ask, of what could these employees have warned him? Should they have told him that it was foolhardy in the extreme to attempt to clamber aboard a freight train moving at 30 MPH in the rain? Ferrell Vincent, Pickard's railroad safety expert, testified that "you're shooting craps anytime you board a moving freight train at more than ten miles an hour" and that "slack action" in a long train[10] "generates terrific force" and will cause one to lose his handhold on a freight car "in a heartbeat" particularly as rain renders that handhold "slick as a whistle."
In response to a question posed to him by Pickard's attorney as to whether the conditions he described were "hidden", Mr. Vincent replied in the affirmative. Had we been sitting as fact finders, we *858 would have been hard pressed to accept that characterization of what seem to us to be self-evident perils involved in attempting to board any vehicle moving at 30 MPH. Even assuming, however, that the question of whether these were "hidden" dangers was a jury issue, as we have noted above, the evidence in this record falls considerably short of establishing that the FEC employees with whom he said he spoke had any greater knowledge than did Pickard of these dangers. It follows, then, and we hold that regardless of Pickard's status at the time of the accident or his allegations of negligence, he has not presented competent, substantial evidence which would impose upon FEC a duty to warn.
Appellee's primary operational level negligence argument is simply cast and baldly stated in "but for" language in his brief. He maintains that but for FEC's employees telling Pickard where to go to hop the freight train, this accident would not have happened. Such an argument may satisfy cause-in-fact but, in our view, it does not address legal/proximate cause.
After his conversation with the FEC employees and whatever his mindset regarding hopping a freight train at the underpass, it is undisputed that he left FEC property and while off premises changed his mind about hopping a freight train in favor of thumbing an automobile ride north on U.S. 1. On his way over to U.S. 1, he changed his mind again, which decision resulted in tragic consequences. Thus, to our minds, the inquiry becomes whether the negligence of FEC's employees set in motion the chain of events leading to Pickard's injuries or simply provided the occasion for Pickard's own gross negligence. We find the latter to be the case and, in this regard, also find the supreme court's decision in Department of Transportation v. Anglin, 502 So.2d 896 (Fla. 1987) to be instructive.
In Anglin, Mrs. Anglin, her husband and his brother drove their truck across a Seaboard Coastline railroad track and through a six-inch deep sheet of water which had accumulated over the highway during a day of heavy rain. The puddled water apparently doused the truck's engine which sputtered and died. With Mrs. Anglin steering, the brothers pushed the truck off the side of the road. Thereafter, with Mrs. Anglin again in the driver's seat, the brothers pushed the truck trying to jump-start it. When this proved unavailing, Mrs. Anglin got out of the truck and joined her brother-in-law in pushing while her husband got behind the wheel.
Some fifteen minutes after the Anglin truck hit the water puddle and with the Anglins still pushing the stalled truck, a truck being driven by one DuBose passed them heading in the opposite direction. Seeing the Anglins predicament, someone in the DuBose vehicle yelled to them that help was on the way. After traveling a short distance, the DuBose truck turned around and drove back toward the Anglin vehicle at a rate of speed too great for prevailing conditions. DuBose failed to stop the truck and it barrelled into Mrs. Anglin causing injuries which resulted in the amputation of her legs.
In due course, the Anglins filed suit against the Department of Transportation and Seaboard Coastline Railroad alleging negligent design of the railroad tracks and the adjacent roadway which resulted in the pooling of water as above described. The defendants' motions for summary judgment were granted based upon the trial court's reasoning that as a matter of law, the actions of the Anglins in leaving their place of safety and pushing their disabled truck back onto the highway and DuBose's losing control of his truck were independent, efficient, intervening causes of the accident which broke the chain of causation between the alleged negligence of Seaboard and the Department of Transportation and Mrs. Anglin's injuries.
On appeal, this court reversed the granting of summary judgment by the trial court, finding that a jury question was presented on the issue of whether plaintiff's injury was within the scope of danger or risk arising out of defendants' negligence. The supreme court, finding no such jury question, quashed this court's opinion, reasoning that the negligence of the defendants *859 in allowing water to pool did not set in motion a chain of events which culminated in Mrs. Anglin's injury. The court also laid to rest the notion that all questions involving intervening cause require resolution by a jury. In so doing, the Court cited with approval the third district's opinion in Stahl v. Metropolitan Dade County, 438 So.2d 14 (Fla. 3rd DCA 1983), which held that as a matter of law and policy, tort liability ought not attach to results which, although caused by the defendants' negligent act or omission, "... seem to the judicial mind highly unusual, extraordinary, bizarre or, stated differently, seem beyond the scope of any fair assessment of the danger created by the defendants' negligence." Anglin, 502 So.2d at 899, citing Stahl, 438 So.2d at 19. (Emphasis added).
Applying the lesson of Anglin to the case at hand, we find that Pickard's departure from FEC premises, his abandonment of his earlier expressed intention to hop a freight train across the St. Johns River, the change of mind that brought him once again onto FEC property and his bizarre, reckless or, at best, highly unusual and extraordinary attempt to board a swiftly moving freight train in the rain combined into an active, independent and efficient intervening cause that severed the tenuous chain of causation between the negligence of FEC's employees and Pickard's injuries. Otherwise stated, in our view, Pickard's actions recounted above were so far beyond the realm of foreseeability that, as a matter of law and legal policy, FEC should not be held responsible for the injuries he suffered. He tempted misfortune once too often or as Ferrell Vincent described it, he opted to "shoot craps" with chance and chance won.
REVERSED and REMANDED for further proceedings consistent with this opinion.
SMITH, J., specially concurs and ZEHMER, J., dissents.
SMITH, Judge, specially concurs.
I concur in the result reached in the opinion by Judge Miner.

ON MOTION FOR REHEARING
PER CURIAM.
The motion for rehearing is denied.
SMITH, and MINER, JJ., concur.
ZEHMER, J., dissents with opinion.
ZEHMER, Judge (dissenting).
Having registered my dissent to the majority decision to reverse the appealed judgment (there being no majority opinion joined in by at least two judges) without setting forth my reasons in a written opinion, and having been justifiably criticized for this omission in appellant's motion for rehearing (it has been my usual practice to explain my reasons for dissenting), I now write to explain why I again dissent to the court's decision to deny appellant's motion for rehearing. I would grant rehearing, withdraw the prior decision, and affirm the judgment of the circuit court for the reason that the majority's decision to reverse is based on a misunderstanding and misapplication of the law to the facts of this case. To more fully explain my reasoning, it is necessary to briefly restate the material facts.
Alan Pickard's right leg and left foot were severed when he tried to "hop" a moving train operated by Florida East Coast and fell under the wheels of a flatcar. Pickard testified at trial that, prior to the accident, he was walking along tracks in the Florida East Coast freight yard in Jacksonville, carrying a bedroll and a backpack, and came to a set of buildings where he saw workers. He noticed two men get out of a vehicle he identified as a Florida East Coast company car near the tracks. One of the men was holding a clipboard. He asked the man where he could catch a freight train across the river, and the man pointed to the University Boulevard bridge and told him what time the train was due to pass and where it was going. Pickard told the man "thank you," and the man replied, "good luck." Pickard then walked directly through the yard, past several employees, and followed the man's directions to the bridge. When the train came, he *860 threw his backpack on the flatbed and reached for the handle. The train jerked, threw him to the ground, and severed his right leg and left foot.
Ruby Spurway, administrator of general claims for Florida East Coast for 14 years, was called by the plaintiff and testified that she maintained the records on all accidents occurring on Florida East Coast property. She stated that, although trespasser accidents occur "fairly often," "pretty frequent," and "at least twice a month," Florida East Coast maintains no written instructions, rules, or regulations instructing Florida East Coast employees on procedures to be followed when trespassers are encountered on the company's property.
Farrell Vincent, a retired safety inspector for the Federal Railroad Administration, testified that he had served in that position for 23 years and that his expertise was in the area of railroad operating rules and practices. He stated that a major portion of his duties consisted of investigating all of the major railroad accidents that occurred within his area of inspection and that Florida East Coast's trespasser-accident rate was four times greater than the national average. In his opinion, Florida East Coast was in violation of common and accepted railroad safety standards based on written rules requiring employees to take protective action as to trespassers and instructing employees in methods to achieve that result. He read to the jury rules of two railroads addressing this problem and testified that those rules are standard throughout the railroad industry. He explained that the federal government required all railroads to submit and file a copy of their operating and safety rules with the FRA, and that federal regulations required that railroads periodically instruct their employees in the written rules and make field checks to ensure that the employees are complying with the written rules. He stated that there was no comparison between a written rule and having "some kind of nebulous policy nobody knows or understands." He explained that there are many hidden dangers associated with trying to board a moving train: for example, the speed of a moving train is very difficult to calculate, slack action generates a terrific force that will grab a handhold out of a hand "in a heartbeat," and loose rocks in the track beds make running on those beds very hazardous.
After the court denied Florida East Coast's motion for a directed verdict at the end of Pickard's case on the ground that the evidence of negligence on the part of Florida East Coast was legally insufficient to warrant submitting the case to the jury, Florida East Coast presented evidence that four or five "no trespassing" signs were located within the immediate vicinity of the accident. Raymond Wyckoff, Florida East Coast's president, testified that "no trespassing" signs are posted every 500 feet between Jacksonville and Miami on both sides of the right-of-way and at crossings. He admitted that Florida East Coast has no written rule directing employees how to deal with trespassers, but stated that "everyone" knows not to permit trespassers on the property. Wyckoff testified that the train involved in the accident had no schedule, and only the dispatcher knew what time it would pass the location where Pickard tried to board. He stated that no Florida East Coast employee is authorized to tell trespassers where they can hop a freight, and if employees did, it would not be within the scope of their employment or in furtherance of the company's business. Investigator Kenneth Bucher testified that he interviewed Pickard five days after the accident, and Pickard told him that Florida East Coast could not have done anything to avoid the accident, and that he was at fault and should not have been there. Carolyn Barrickman, a Florida East Coast policewoman who accompanied Bucher when he interviewed Pickard, corroborated Bucher's testimony. Fred James, the Florida East Coast engineer operating the train that hit Pickard, testified that he did not see Pickard at all and that there was no way he could have avoided the accident. Only the yardmaster knew where his train was going and when. Florida East Coast renewed its motion for directed verdict at the close of all the evidence, and the court took it under advisement.
*861 The judge instructed the jury that if they determined that Pickard was a trespasser or licensee and that his presence was not known to Florida East Coast, the duty on the part of Florida East Coast was only to avoid willful and wanton injury to Pickard. The court further instructed, however, that even if Pickard was a trespasser or licensee, if Pickard's presence was known to Florida East Coast, the railroad had a duty to use reasonable care for his safety. The trial judge also instructed the jury to determine whether Florida East Coast was negligent in failing to maintain a written policy to prevent trespasser accidents, and, if Florida East Coast was negligent in that regard, whether such negligence was the legal causal of Pickard's injuries. No issue of the propriety of these instructions is raised on appeal.
The jury returned a verdict finding Pickard 90 percent negligent, Florida East Coast 10 percent negligent, and assessing gross damages in the amount of $4,000,000.00. The court entered final judgment in accordance with the verdict and ordered Florida East Coast to pay Pickard $400,000.00 in damages, thereby implicitly denying the motion for directed verdict it had taken under advisement at the end of the evidence.
The trial court did not err in denying Florida East Coast's motions for directed verdict. In Helman v. Seaboard Coast Line Railroad, 349 So.2d 1187 (Fla. 1977), a personal injury action arising out of a railroad crossing collision, the supreme court reviewed the fourth district's reversal of a jury verdict and stated that the following "three incontrovertible premises" were relevant to its disposition of the case: (1) it is not the function of an appellate court to reevaluate the evidence and substitute its judgment for that of the jury; (2) if there is any competent evidence to support a verdict, that verdict must be sustained regardless of the appellate court's opinion as to its appropriateness; and (3) the question of whether a defendant's negligence was the proximate cause of the injury is generally one for the jury, unless reasonable men could not differ in their determination of that question.
In this case, the testimony of Ruby Spurway and Farrell Vincent supplied competent, substantial evidence to support a jury finding that Florida East Coast was negligent in failing to implement and maintain a clear policy evidenced by rules directing employees in the prevention of accidents to trespassers, and that such negligence was a contributing cause to Pickard's injuries. The jury could infer from Pickard's testimony that the two men he talked to were Florida East Coast employees, that they became aware that Pickard was a trespasser or licensee who intended to hop a train across the river, and that the employees failed to attempt to stop him and remove him from the property or to warn him of the danger, but rather told him where to hop the appropriate train. The testimony of Florida East Coast's president and its other employees merely contradicted evidence presented during the plaintiff's case, thereby creating disputes in material facts to be resolved by the jury; their testimony did not establish the railroad's innocence of this negligence charge as a matter of law. Thus, the trial court correctly submitted the issue of negligence to the jury.
After determining that Florida East Coast was negligent, however, the jury still had to determine whether such negligence was a proximate cause of Pickard's injury. Helman, 349 So.2d at 1190. The evidence before the trial court clearly made out a jury issue on this element. The jury could legitimately infer that, instead of directing Pickard not to attempt such a dangerous undertaking and ordering him off the property, the negligent conduct of the railroad's employees assisted and encouraged Pickard to continue pursuing his obviously dangerous intended course of action to hop the next train.
Florida East Coast and Judge Miner's opinion do not complain so much that this causal nexus was not established by the evidence; rather, they rely on the doctrine of independent intervening cause, contending Pickard admitted that, after he reached the University Boulevard overpass, he left the railroad premises and went to a Wendy's restaurant located at the foot of the University Boulevard bridge, where he obtained a cup of coffee and waited until he *862 heard the train coming. This admitted fact, Florida East Coast argues, was an intervening act constituting a break in the chain of causation as a matter of law and, therefore, terminated Florida East Coast's liability for the negligent acts of its employees while Pickard was a trespasser on its property. I agree that the jury could have so interpreted the evidence; but I disagree that the jury was required to so interpret the evidence as a matter of law, the only basis on which the trial court could enter a directed verdict for the defendant. This court recently reversed a final order directing a verdict for a defendant because the trial court had determined, as a matter of law, that an intervening cause was not foreseeable. Layden v. Corrections Corporation of America, 570 So.2d 994 (1st DCA 1990). The court stated:
Ordinarily the question of whether an intervening cause was foreseeable is for the trier of fact. Our Lady of Divine Providence v. Sweetwater, 482 So.2d 440 (Fla. 3d DCA 1986). Only when reasonable persons could not differ as to whether an intervening cause was foreseeable may the court determine the issue as a matter of law. 482 So.2d at 442. Here, reasonable persons could differ in their determination as to whether Ms. Cleavinger's failure to invoke the speedy trial rule was foreseeable. Evidence was presented that CCA knew Layden's quarantine status was preventing him from communicating with his attorney and appearing in court, and knew Layden did not have infectious hepatitis, yet it continued to hold him in quarantine while doing nothing to correct the misinformation it had previously communicated to Ms. Cleavinger. Cleavinger testified that but for CCA's placement of Layden in quarantine, she would have invoked the speedy trial rule. The credibility of that testimony, and the weight to be given it in determining whether and to what extent CCA was a legal cause of damage to Layden, were issues for the jury.

570 So.2d at 995.
The plaintiff in this case was no less entitled to a jury determination on the issue of intervening cause than was the plaintiff in Layden. Furthermore, the jury was legitimately entitled to infer that, even though Pickard went to a nearby restaurant to get a cup of coffee while waiting for the train to arrive, he never abandoned his intended course of action to hop a train pursuant to his encounter with the railroad employees and encouragement by their negligent conduct to pursue his intended course of action without receiving any warning of the extreme dangers involved. Since the jury could so find, application of the doctrine of an independent intervening cause as a matter of law was completely negated. I find nothing in the evidence that required the trial court to attribute to Pickard, as a matter of law, the intention to abandon his endeavor to hop a train.
The trial court correctly assessed the evidence and determined that causation was a disputed factual issue on which reasonable persons could differ. This court's decision to reverse is necessarily predicated on a misinterpretation and misapplication of the law, and constitutes an unwarranted override of the jury's legitimate fact-finding function. I would, therefore, grant rehearing and affirm the trial court's judgment.
NOTES
[1] The identities of these persons remains unknown.
[2] He testified that among those with whom he had discussed the subject, it is common practice "not to get on the train unless you know where it's going."
[3] Nowhere in his counsel's opening statement, in his deposition testimony which was read into the record at trial, or in his direct testimony at trial, did Pickard mention that he left the FEC premises and thereafter returned, or that when he left the restaurant he intended to walk to U.S. 1 and thumb a ride. This testimony was elicited on cross-examination by FEC's counsel.
[4] Appellant failed to list these issues in its initial brief as required by Rule 9.210(b)(1) of the Fla.R.App.P. Thus, we have had to formulate the points in controversy using the concluding paragraphs of appellant's initial brief.
[5] Uncontradicted testimony from accident investigator Bucher and Ms. Barrickman of FEC's property protection division revealed that they interviewed Pickard in the presence of his mother five days after the accident, that he appeared to be in full control of his faculties and that, as he described the events leading up to the accident, he made no mention of any conversation with anyone in the FEC freight yard. Both testified that they first learned of such a conversation when questioned on cross-examination by Pickard's attorney at trial. Both witnesses also testified, again uncontradicted, that Pickard said he knew he had no business being at the site of the accident, that it was his fault and FEC could not have done anything to prevent it. In his trial testimony, Pickard did not explain his failure to apprise the investigators of the conversation with the two men nor did he deny making the statements attributed to him. During her testimony, Pickard's mother, who sat through the interview, did not deny that her son made the statements testified to by investigator Bucher and Ms. Barrickman.
[6] The standards of the railroad industry as embodied in the written Seaboard policy apparently do not require employees to escort unauthorized persons off the premises unless those persons are children of tender years.
[7] Section 860.04, Florida Statutes provides:

Any person who, without permission of those having authority, with the intention of being transported free, rides or attempts to ride on any railroad train in this state shall be guilty of a misdemeanor of the second degree, punishable as provided in Section 775.082 or 775.083.
[8] Testimony at trial indicated that University Bridge, a structure measuring some three city blocks in length and spanning more than two dozen railroad tracks was barely visible from the point Pickard said he encountered the two FEC employees.
[9] At trial this exchange took place between Pickard and his attorney:

Q. Did you have an appreciation of the dangers of catching a freight train?
A. I thought I did. But now I do.
[10] In his trial testimony, Pickard described the train he tried to catch as "short." Other testimony established that it was 22 cars in length.